# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| KAREN STANLEY, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.:  4:06-CV-695-RDP** |
| | } | |
| HONDA MANUFACTURING OF | } | |
| ALABAMA, LLC, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

Pending before the court is Defendant Honda Manufacturing of Alabama, LLC's ("HMA")

Motion for Summary Judgment (Doc. # 12) filed on March 16, 2007.  The court held a hearing on

all pending motions in this case on May 25, 2007.  The motion is now under submission and ripe for

decision by the court.  For the reasons set forth below, the court finds the motion is due to be, and

is hereby, granted in part and denied in part.  Specifically, the court grants Defendant judgment as

a matter of law on Plaintiff's race discrimination and retaliation claims, but the court finds that a

genuine issue of material fact precludes summary judgment for Defendant on Plaintiff's age

discrimination claims.

## II.    STATEMENT OF FACTS

### A.     Honda Manufacturing of Alabama, LLC

HMA employs approximately 4,500 individuals at its Lincoln, Alabama plant.  (Doc. # 14

Ex. B ¶ 4).  HMA employees—known as associates—work in a rigid environment, in which team

work is important and associates are expected to place parts on moving vehicles.  (Doc. # 14 Ex. A

at 32).  Team Coordinators ("TCs") distribute work assignments to associates, but do not have the

authority to hire, fire, discipline, or evaluate them.  TCs report to Team Managers ("TMs"), and in turn TMs report to Department Managers ("DMs").  (Doc. # 14 Ex. B ¶ 5).  At all relevant times, HMA had in place an Equal Employment Opportunity and Mutual Respect Policy, which states "HMA is committed to providing a work environment where all associates are treated with dignity and respect and are free from all forms of discrimination and conduct which can be considered harassing, coercive, or disruptive."  (Doc. # 14 Ex. A at 33–34 & Attachs. 3 & 4, Ex. B ¶¶ 7–8). Associates must demonstrate appropriate behavior and are instructed to "[t]reat all members with respect and [to] not engage in conduct that could be considered as harassment, intimidating, indecent or offensive."  (Doc. # 14 Ex. A at 39–40 & Attach. 4 at 11, Ex. B ¶ 9).  Plaintiff contends that HMA has not consistently enforced these policies.  (Doc. # 14 Ex. A at 64–65, 70–71, 77–80, 82–86, 87–90, 91–92).

HMA has a progressive discipline policy, the purpose of which is to induce employees to correct their behavior so that they will not be necessary to involuntarily terminate their employment. (Doc. # 15 Ex. H at 15).  This policy progresses through various disciplinary actions that HMA takes in reference to an employee: (1) verbal warning; (2) written warning; (3) Level I written counseling; (4) Level II written counseling; and (5) termination.  (Doc. # 14 Ex. A Attach. 4 at 10).  Any level of corrective action may be taken based upon the conduct's seriousness, the associate's employment and corrective action history, the effect of the conduct on associates and third parties, and any other relevant facts or circumstances.  (Doc. # 14 Ex. A Attach. 4 at 12, Ex. B ¶ 10, Ex. D ¶ 6).  TMs determine whether an incident will be reported to Associate Relations ("AR") or not, and Associates may make complaints as well.  (Doc. # 15 Ex. H 13).  AR representatives investigate incidents (although there is some discretion in what gets investigated) and Associate Relations TM Robb

Harris ("Harris") reviews these investigations for consistent application of Honda's policies. (Doc. # 15 Ex. J at 10–11, Ex. K 9–10, 12, 22–24). In the AR team meetings, associate complaints that are not found to warrant investigations are discussed. (Doc. # 15 Ex. K at 26). To ensure consistency of discipline with previous conduct it is the "collective memory" of the AR group that is utilized to inform a disciplinary recommendation, with the individual AR investigator having discretion to make any initial recommendation. (Doc. # 15 Ex. J at 13–14, Ex. K at 20; Doc. # 16 Ex. M at 30–31). Harris makes the final determination as to issuance of discipline for inappropriate conduct; however, when termination is recommended by an AR investigator, Linda Bailey ("Bailey"), DM of Human Resources, must approve the recommendation. (Doc. # 14 Ex. B ¶ 12, Ex. D ¶ 10; Doc. # 15 Ex. J 30–31). Bailey is a 44-year-old white female; Harris is a 38-year-old white male. (Doc. # 14 Ex. B ¶ 2, Ex. D ¶ 2).

### B.       Plaintiff Karen Stanley

Plaintiff Karen Stanley ("Stanley" or "Plaintiff") was hired by HMA as a Process Associate on Line 1 in September 2001; she requested and received a transfer to Line 2 in July 2003. (Doc. # 14 Ex. A at 61 & Attachs. 1 & 7). When she was hired, Plaintiff was a 53-year-old white female (*id.* at 14), and, with a birth date of May 4, 1948, she was the oldest line employee in her zone. (*Id.* at 14, 173). Plaintiff received a copy of the Mutual Respect Policy, understood its contents, understood HMA's policy of respect for the individual, and knew that complaints of harassment must be reported. (*Id.* at 33–34, 39–40 & Attach. 2).

### C.       Plaintiff's First Written Discipline for Inappropriate Conduct

In June 2003, TM Ray Blackburn ("Blackburn") reported to AR that Plaintiff disrupted a team meeting by making an unprovoked, non-work related accusation that he and associate Janice

Henry were dating. (*Id.* at 42, 46; Doc. # 14 Ex. F ¶ 7 & Attach. A). Plaintiff admits that she spoke

with Blackburn about the fact that Janice Henry wanted to date him both before and during the team

meeting, but denies that remark merited discipline. (Doc. # 14 Ex. A 45–46).

AR Representative Vickie Vaughan ("Vaughan"), a white female, investigated and

determined not only that Plaintiff had interrupted the meeting by making the accusation about her

TM and fellow associate dating, but also, through interviews with associates Marc Oglesby, Keith

Mitchell, Les Osborne, and Sheldon Barclay, that Plaintiff was causing turmoil on the team. (Doc.

# 14 Ex. F ¶¶ 2, 9–10 & Attach. A; Doc. # 15 Ex. L Attach. 12). After Vaughan's investigation,

HMA issued Plaintiff a written warning on July 16, 2003 for inappropriate behavior and performance

problems. (Doc. # 14 Ex. A at 56 & Attach. 6, Ex. F ¶ 11 & Attach. B).

### D.  Denial of Plaintiff's Promotion to Team Coordinator Position

In January 2004, Plaintiff met with Freddie Thomas ("Thomas") and Mark Graham

("Graham") in AR to discuss the July 2003 Written Warning. (Doc. # 14 Ex. A at 202–203 &

Attach. 17, Ex. E ¶ 6 & Attach. A). Plaintiff asked for specific details as to why she was written up,

which Thomas and Graham provided; Thomas and Graham also explained how the Written Warning

impacted promotional opportunities. (Doc. # 14 Ex. A at 202–203 & Attach. 17, Ex. E ¶ 6 & Attach.

A, Ex. F ¶ 11; Doc. # 15 Ex. K at 13–15).

Plaintiff applied for one of six available TC positions in October 2004 and would have been

placed in the sixth position were it not for the July 2003 corrective action. (Doc. # 14 Ex. A at

176–77 & Attach. 14, Ex. B ¶ 13). Plaintiff alleges that TM Jay Spurwold ("Spurwold") met with

Plaintiff about the TC position and asked if she could handle it "because everyone else was younger."

(Doc. # 14 Ex. A at 114). Plaintiff did not file a timely EEOC charge regarding the TC position, did

not mention any failure to promote claims in the EEOC charge she did file, and did not include a failure to promote allegation in her Complaint in this action.  (*Id.* Attach. 8; Doc. # 1).

### E.      Plaintiff's Complaint about Rickey Cotton

In January 2005, Plaintiff requested placement on A shift because she alleged that her TC, white male Rickey Cotton ("Cotton"), had called her "old" and "dumb ass" and was disrespectful to all of the associates in the zone.  (Doc. # 14 Ex. A 189–91 & Attach. 16).  TCs, such as Cotton, are non-supervisory employees who do not have the power to hire, fire, or adjust the work of HMA associates, but they do supervise a zone and make job assignments within their zones. (Doc. # 14 Ex. B ¶ 5).  Plaintiff alleges that she had reported Cotton's comments, including the comment "there are your friends" directed at Plaintiff while a senior citizen group toured the plant, to John Cato, Production TM ("Cato"), TM Tim Sims, and Craig Harvey.  (Doc. # 14 Ex. A at 112–13, 118). Despite those reports, Plaintiff claims Cato, Sims, and Harvey took no action.  (*Id.*)  Plaintiff further alleges that Cotton made an inappropriate comment in front of Cato, and Cato laughed.  (*Id.* at 197–98).  Plaintiff states that Cotton's conduct continued after AR's investigation in January 2005 and that she remained under his supervision. (*Id.* at 197; Doc. # 15 Ex. I at 14).

In January 2005, AR investigated Plaintiff's allegations against Cotton, and she identified only Tyrone Turner ("Turner") and Anita Dent ("Dent") as potential witnesses.  (Doc. # 14 Ex. A at 190 & Attach. 16, Ex. C ¶ 12 & Attach. C).  Turner reported that he did not witness Cotton being disrespectful to anyone.  (Doc. # 14 Ex. A Attach. 16).  Dent stated that Cotton could be stern but only because he was trying to do his job, that she had witnessed Cotton and Plaintiff "having words, that Plaintiff "gave as much as she took" from Cotton, and that numerous associates wanted to switch to "A" shift because of the TC.  (*Id.*).  Cotton denied making any inappropriate remarks to Plaintiff,

stated he had performance issues with her, that she blamed him for not obtaining the TC position, and that other associates had told him that she said negative things about him behind his back. (*Id.*). AR Associate Administrator Kim White, Cato, and DM Bill Donaldson determined that Plaintiff's allegations against Cotton were unsubstantiated and notified Plaintiff of the results of the investigation on January 11, 2005. (*Id.*). Plaintiff never again raised a concern about Cotton to AR, but she alleges she continued to complain to Cato and Sims. (*Id.* at 113).

F.     **Plaintiff's Termination**

On July 20, 2005, a discussion took place in Zone 24 about a Zone 23 associate's offensive odor. (*Id.* at 136–37, 139–40; Doc. # 16 Ex. N ¶ 9, Ex. O ¶ 5, Ex. P ¶ 10). Later that day, according to Defendant, Plaintiff went to the repair lot and confronted Mark Semerick ("Semerick"), a white male Process Associate over forty years of age, about the offensive smell while he was working. (Doc. # 14 Ex. A at 132, 138–40; Doc. # 16 Ex. N ¶ 10). Plaintiff alleges that she was directed by her manager, Cato, to find Semerick in the parking lot and ask him about the odor, and she found him sitting in a vehicle. (Doc. # 14 Ex. A at 137, 140, 141). Plaintiff further testifies that Semerick told her it was Mary, who smelled of "bug spray or something," and then Plaintiff returned to the plant. (*Id.* at 139–40).

On July 22, 2005, Semerick reported to Thomas in AR that, while in the repair lot, Plaintiff "raised her arm and asked him if it stinks and then grabbed her crotch area and said smell this and see if it stinks." (Doc. # 14 Ex. E ¶ 7; Doc. # 16 Ex. M Attach. 1, Ex. N ¶¶ 13–14). Semerick had also reported that two months prior, Plaintiff, without provocation, offered to show him and another male associate her breasts. (Doc. # 16 Ex. M Attach. 1). AR representative Jenny White ("White"), a white female, conducted the investigation into Semerick's complaint because she was working

second shift that week, as were the associates in Plaintiff's zone.  (*Id.* at 15–16).  White, along with Cato, interviewed the associates in Plaintiff's zone about Semerick's complaint by approaching those witnesses to talk about the accusations against Plaintiff.  (Doc. # 14 Ex. C ¶¶ 16–17, Ex. G ¶ 9; Doc. # 16 Ex. M at 77, 83).  Sandricus Hunter, an associate in Plaintiff's zone, reported that she saw Plaintiff thrust her crotch forward to Semerick, and state "smell my puss;" she further testified that, a few weeks earlier, Plaintiff told Larry Bolin that her "puss was tighter than his fist and it would cost $25,000 to see it," and that Plaintiff talked about making candy in the shape of "breasts," "penises," and "pussies."  (Doc. # 14 Ex. G ¶ 11 & Attach. C).  Another associate, Tabatha Crosby, reported that she saw Plaintiff sniff between her legs, asking if it was her that smelled, that Plaintiff used "very foul language," which caused Crosby to stay away from her, and that she did not like to be around Plaintiff.  (*Id.* at ¶ 13 & Attach. C; Doc. # 16 Ex. M Attach. 1, Ex. O ¶¶ 5–6).  Larry Bolin reported Plaintiff asked him if he wanted to see her breasts, which she said had been reduced to size "D," that Plaintiff also remarked "her pussy was as strong as a vice—she could rip any man's dick off" and "it would cost $25,000 just to smell it," and stated his view that "it is hard to be a team when people like [Plaintiff] try to tear the team down."  (Doc. # 14 Ex. G ¶ 14 & Attach. C; Doc. # 16 Ex. M Attach. 1).  B.J. Player reported that he had heard Plaintiff say something about a crotch odor as he was walking away from the repair area, and that he tried to keep distance between himself and Plaintiff.  (Doc. # 14 Ex. G ¶ 16 & Attach. C; Doc. # 16 Ex. M Attach. 1).  Dent reported that Plaintiff had grabbed her crotch and said to Semerick, "smell my pussy," which appeared to make him upset and red-faced, that "pussy" was part of Plaintiff's vocabulary, that Plaintiff had said earlier "her pussy was so tight it could break any man's penis," that she talked about making chocolate candy shaped like penises and breasts and asked Dent if she wanted any, and that Plaintiff had

offered to show her breasts to other associates who had declined to look.  (Doc. # 14 Ex. G ¶ 15 &

Attach. C; Doc. # 16 Ex. M Attach. 1).  TC Rickey Cotton stated that Plaintiff was very vulgar and

negative and was the number one problem in his zone.  (Doc. # 14 Ex. G ¶ 17 & Attach. C; Doc. #

16 Ex. M Attach. 1).  Pam Twymon reported that Plaintiff cursed a lot and frequently said "fuck" and

that no other associate acted the way Plaintiff acted.  (Doc. # 14 Ex. G ¶ 17 & Attach. C; Doc. # 16

Ex. M Attach. 1).  Kevin Wood reported Plaintiff had offered to show him her breasts and that she

had stated that "her pussy would cut a man's dick off." (Doc. # 14 Ex. G ¶ 17 & Attach. C; Doc. #

16 Ex. M Attach. 1).  Brian McBurnett reported Plaintiff stated "find me a man and pay 25K to break

his thing off and sniff her," that he did not talk to Plaintiff unless he had to do so, that she tried to

cause problems, and that all the trouble in the zone was caused by her.  (Doc. # 14 Ex. G ¶ 17 &

Attach. C; Doc. # 16 Ex. M Attach. 1).  Based on her investigation, White knew there were some

inappropriate comments taking place, but did not ask about those made by others.  (Doc. # 16 Ex.

M at 84).  In spite of this, she had a conversation with Cato about making sure people knew what

was appropriate for the workplace.   (*Id.* at 85).

   In Plaintiff's interview regarding the incident, when she asked if she engaged in such conduct

she stated "no I have not".  (Doc. # 14 Ex. A at 154).  Plaintiff admitted that she stated that Cotton

"needs to think with his other head," but insisted that she was only repeating Dent's comments.  (*Id.*).

She further admitted that she spoke about her hysterectomy and breast reduction when asked, and

admitted talking about candy in the shape of breasts and penises, but not that she had made any

herself, and denied cursing or engaging in any other inappropriate behavior.  (*Id.* at 67–68, 140, 147,

149, Attach. 2; Doc. # 15 Ex. H ¶ 18 & Attach. C; Doc. # 16 Ex. M Attach. 1).  Plaintiff later swore

under penalty of perjury in her EEOC charge that she made no inappropriate comments and that no investigation was conducted into the allegations against her. (Doc. # 14 Ex. A Attach. 8).

After conducting her investigation, White found the statements by other witnesses about Plaintiff to be truthful and did not believe Plaintiff's statements that she did not engage in the conduct alleged. (Doc. # 14 Ex. G ¶ 21). Through the investigation, White concluded Plaintiff had engaged in inappropriate behavior in violation of HMA's Mutual Respect Policy, particularly her comments to Semerick, her comments about the tightness of her vagina and what she believed it could do to a man's penis, her statement about her TC needing to think with his other head, and her offers to display her breasts to other associates. (*Id.* at ¶ 22). Plaintiff asserts that none of these comments were reported when made (except the comment to Semerick regarding the odor), that such non-reporting, although required under HMA policies, did not result in any discipline, and that none of the comments were offensive to the person to whom they were directed, which is a prerequisite to a violation of HMA's Mutual Respect Policy. (Doc. # 15 Ex. I at 37; Doc. # 16 Ex. M at 59, 71, 72, 76; Doc. # 19 Ex. 2 at 1, 9).

Citing the nature and severity of Plaintiff's sexually inappropriate conduct and gestures, and noting that she had previously been disciplined and counseled for engaging in inappropriate behavior and failing to treat her co-workers with respect, White recommended Plaintiff's termination as the appropriate action. (Doc. # 14 Ex. G ¶ 24; Doc. # 16 Ex. M 52). Cato concurred in the recommendation for termination, but could not independently make the decision. (Doc. # 15 Ex. I at 33). Bailey reviewed the Summary of Events prepared by White and approved the termination. (Doc. # 14 Ex. B ¶¶ 14–17 & Attachs. D, E, & F; Doc. # 15 Ex. H at 38–39). On August 3, 2005, White, Cato, and DM Jay Sturwold terminated Plaintiff's employment. (Doc. # 14 Ex. A at 127–29

10

& Attach. 11).  Although Defendant insists that Plaintiff was not specifically replaced, the next

associate hired into Plaintiff's former zone and team (zone 23, team "B") was Donna Davis, a

44-year-old white female.  (Doc. # 19 Ex. 3)

### G.      Plaintiff's Evidence of "Comparators"

On July 20, 2005,[1] the same day as Plaintiff's alleged repair lot conduct, Plaintiff reported

to AR that Dent, a black female, placed a note on Kevin Wood's ("Wood") back stating, "I love little

boys." (Doc. # 14 Ex. A 97–99 & Attach. 9, Ex. G ¶ 27 & Attach. F).  Although Plaintiff understood

the note to refer to pedophilia, Wood took the note as a joke, was not offended, and did not report

it to AR himself.  (Doc. # 14 Ex. G ¶ 30; Doc. # 16 Ex. Q ¶¶ 5–6).  Plaintiff retrieved the note from

the garbage and brought it to Peggy Anderson in AR.  (Doc. # 14 Ex. A at 100–101, 105).  White,

working second shift, conducted the investigation into the note.  (Doc. # 14 Ex. G ¶¶ 27–28); Doc.

# 16 Ex. M 43–44, 77–78).  Plaintiff alleges the investigation was superficial as it did not investigate

the pedophiliac reference in the note.  (*Id.*)  White interviewed Plaintiff, Wood, Bolin, and Dent;

Dent admitted placing the note on Wood's back because he hid her things. (Doc. # 14 Ex. G ¶¶

29–32; Doc. # 16 Ex. M at 87–88 & Attach. 3). White determined that Dent's conduct was horseplay

violating HMA's Mutual Respect Policy and Appropriate Conduct Policy.  (*Id.*)  Dent, who had no

prior corrective actions, was issued a written warning on July 29, 2005.  (Doc. # 14 Ex. A at 99, Ex.

G  ¶ 33 & Attach. G).

Plaintiff later testified that she heard inappropriate comments made by Dent, Semerick,

Genesis Maddox, Carlos Chavers, Calvin Beard, Wood, and McBurnett, but admits she did not

[1]Although Plaintiff insists that Defendant is incorrect, and that she reported Dent's conduct on July 20, 2005—the same day of the repair lot incident and two days prior to Semerick's complaint about Plaintiff—all of the records (save Plaintiff's bare assertion) show that the date of Plaintiff's report was July 22, 2005 *and* Dent's *conduct occurred* on July 20, 2005.

report any of these statements until after Semerick had complained about her. (Doc. # 14 Ex. A at 228–29, Ex. C ¶¶ 8, 18, Ex. E ¶ 4, Ex. G ¶ 19). In her deposition, Plaintiff testified that the comments of her co-workers included the following: exploits with a married woman's boyfriend; explicit profanity; a woman talking about the size of her boyfriend's penis, how he "licked her", and how he would put her breasts between his legs and rub them; how a co-worker had gotten pregnant by a married man; two women talking about how black men have bigger penises than white men; a male grabbing his crotch, and making specific, sexual comments to Plaintiff; a man talking about how well-endowed he was; and a female co-worker stating she wanted to have an older man take care of her and that she would only have to have sex with him a couple of times per week. (Doc. # 14 Ex. A at 77–92). Plaintiff testified that she was not offended by any of the alleged sexually-related comments or conduct of her co-workers and did not report the aforementioned specific incidents to AR. (Doc. # 14 Ex. A at 81, 83, 86, 89, 91–92). Cato testified that he may have heard dirty jokes or inappropriate conversation on the line. (Doc. # 15 Ex. I at 24–27).

White was aware of Plaintiff's complaints about the co-workers before she recommended Plaintiff's termination on July 26, 2005. (Doc. # 16 Ex. M at 120–21). White interviewed Crosby, Chavers, Pam Twymon, Beard, Wood, McBurnett, Semerick, Althea Thornton, and Kenneth Anthony about the allegations Plaintiff first reported on July 26, 2005, but none of those witnesses provided support for Plaintiff's allegations. (Doc. # 16 Ex. M at 76 & Attach. 1). White determined that Plaintiff's allegations of sexually inappropriate conduct by her co-workers interview were unsubstantiated. (Doc. # 14 Ex. G ¶ 19).

Kevin Bennett, a 27-year-old white male, was terminated on August 22, 2005 following a complaint against him for sexually inappropriate comments and gestures that was substantiated by

an AR investigation.  (Doc. # 14 Ex. B ¶ 19; Doc. # 14 Ex. E ¶¶ 13–14 & Attach. E & F).  Associate

Catrina Boley complained to AR representative Mark Graham that Bennett had made inappropriate

sexual comments to her calling her "wonder bush" and "shaggy" in reference to her private area and

asking her if she would like to borrow his Norelco.  (Doc. # 14 Ex. E ¶ 13 & Attach. E).  AR

Representative Thomas investigated the allegations and recommended termination of Bennett after

his interviews corroborated Boley's complaint and uncovered additional inappropriate comments.

(Doc. # 15 Ex. K at 60; Doc. # 14 Ex. E ¶ 13 & Attach. F).  Thomas stated that Bennett made it easy

for Thomas to recommend termination, because "if you look at the documents, he didn't deny a lot

of it," and, therefore, there was no need for Thomas to make a credibility determination.  (Doc. # 15

Ex. K at 61).

      At the time of his termination, Bennett had the following discipline: (1)  he reported to work

under the influence of alcohol, and then lied about it to AR (Doc. # 15 Ex. K at 29–30);[2] (2) Bennett

violated the Appropriate Behavior and Mutual Respect policies by engaging in horseplay and for this

offense he received a Level I written counseling (Doc. # 15 Ex. K at 37–38; Doc. # 19 Ex. 6); (3)

Bennett had two coachings for harassment and horseplay (Doc. # 19 Ex. 8); (4) Bennett had received

a verbal coaching for inappropriate conduct towards a female whom he had been dating (Doc. # 15

Ex. K at 46); (5) Bennett received a Level II written warning for eleven violations of safety and

performance policies and five violations of the Appropriate Conduct Policy (Doc. # 19 Ex. 7); (6)

when caught spray painting graffiti on the wood floor conveyor, Bennett lied to AR, and one of the

spray-painted images was a smiley face with a long, oblong object protruding from its mouth (Doc.

---

[2]Bennett received no discipline for this, but he did get a paid suspension in spite of the fact
that having alcohol in his system violates policy, as does providing false information.  (*Id.* at 31–32,
43; Doc. # 19 Ex. 5).

# 19 Ex. 7 at 717; Doc. # 15 Ex. K at 52);  and (7) Bennett told his manager, Reid White, that he had drawn a picture that looked just like him with "one this long in his mouth, holding his hands twelve inches apart" hanging from the mouth of the drawing and admitted making this comment.  (Doc. # 15 Ex. K at 54, 57, Attach. 16).[3]  Bennett was informed each time that his performance and behavior must improve or would be subject to termination on the next offense. (Doc. # 15 Ex. H at 48; Doc. # 19 Exs. 5, 6, 7, & 8).

AR representative Jean Pruitt issued a Level II written counseling to a 48-year-old, black male associate, Marvin Moore ("Moore"), based on a complaint by associate Antonio Sandridge ("Sandridge"). (Doc. # 16 Ex. M Attach. 8).  Sandridge complained that Moore had made him uncomfortable by looking around the divider wall in the men's restroom and had made threatening remarks to him.   Moore admitted he threatened that Sandridge "would lose a chunk of his ass" in an argument but stated he had accidentally stepped on Sandridge's foot, causing him to believe he was looking around the divider wall.  (*Id.*).  Other associates reported Moore and Sandridge saying "fuck you" to each other, that Moore had called other associates "do do boy," and had told Sandridge to "make his ass cheeks clap." (*Id.*).  Moore was terminated on September 1, 2005, based on the recommendation of White and Cato, for stating to his supervisor that he was tired of these "fucking rules" and that he was going to "fucking AR." (Doc. # 15 Ex. H at 24, 32; Doc. # 16 Ex. M at 110).  Plaintiff does not dispute this, but adds that the majority of Moore's conduct occurred in May and June 2005 and notes that not all of the AR files surrounding these incidents has been located by HMA.  (Doc. # 15 Ex. H at 26; Doc. # 19 Ex. 10).

---

[3]For this latter offense, the AR representative recommended termination, but the recommendation was not followed by AR.  (*Id.* at 56).

### H.    Plaintiff's Allegations of Discrimination and Retaliation

Plaintiff bases her age claim on: TC Cotton's alleged comments to her (and for which he was not disciplined); Sturwold's alleged question as to whether she could handle the TC position because everyone was younger; an unidentified person saying HMA had to hire a certain number of people over 40; her assertion she did not do the things for which she was fired; her averment that HMA did not consistently enforce its policies and discipline associates; other evidence (*i.e.*, that she was replaced by Donna Davis, who is substantially younger than Plaintiff); and her general speculative belief that HMA does not value older people.  (Doc. # 14 Ex. A at 96, 112–15, 124–26; Doc. # 19 Exs. 3–10).  Plaintiff bases her race claim on: statements allegedly made by Honda of Canada employees that black people had to be hired; that Canadian employees, Cotton, and TC Tim Sims ("Sims") said HMA was afraid of being sued by blacks; her allegation that Jason Nichols, Sims, and Cotton mentioned several times that Honda favors blacks over whites; her allegation that Sims stated a few times to Plaintiff that "nothing is going to happen to them, they are black"; that Dent and Moore were treated and disciplined differently from Plaintiff; and that Genesis Maddox, who is black, had been written up for sexual harassment, but not fired. (Doc. # 14 Ex. A at 115–24; Doc. # 19 Ex. 4, 9, & 10).  Finally, Plaintiff claims she was terminated in retaliation for reporting the note Dent attached to Wood's back and the allegations she made about Cotton calling her old and falsifying documents.  (Doc. # 14 Ex. A at 98, 159–60).  As additional evidence to support her claims, Plaintiff submits that although White testified under oath at Plaintiff's unemployment benefits hearing, in granting Plaintiff her unemployment benefits, the appeals referee stated:   "The most competent evidence does not support a finding that the claimant [Plaintiff] displayed any deliberate disregard for reasonable standards of behavior, or that her discharge was a result of

misconduct under the Unemployment Compensation Law." (Doc. # 19 Ex. 11; Doc. # 16 Ex. M at 95–96).

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R .CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only

meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial. But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   ANALYSIS

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 143 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocations of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that model applies only in cases where there is no direct evidence of discrimination. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas*/*Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden of production, the plaintiff must either present substantial evidence which shows (1) that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* (2) a reasonable jury could conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253–54; *Desert Palace*, 539 U.S. at 99–102.

18

### A.   Plaintiff Has Failed to Establish a Genuine Issue of Material Fact Related to Her Race Discrimination Claim.

As Plaintiff has not alleged any direct evidence of racial discrimination, the burden-shifting framework of *McDonnell Douglas/Burdine* governs Plaintiff's reverse race discrimination claims. Plaintiff may establish a *prima facie* case in one of two ways.  She may show that: (1) she is a member of a protected class; (2) she suffered an adverse job action; (3) her employer treated similarly-situated employees outside her classification more favorably; and (4) she was qualified to do the job.  *McDonnell Douglas*, 411 U.S. at 802; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted); *Coutu v. Martin City Bd. of City. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995).  Alternatively, she could demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was discharged; and (4) her former position was filled by a person outside her protected class.  *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1290 (11th Cir. 1998).  Thus, Plaintiff must prove that she was treated less favorably than a similarly-situated African-American employee because of intentional discrimination or that she was replaced by an African-American.  Here, she can do neither, and thus has failed to establish a *prima facie* case of discriminatory discharge.

It is undisputed that Plaintiff was replaced by a white female (albeit a younger female, a point that will be discussed *infra*).  Nevertheless, Plaintiff insists that she can still establish a *prima facie* case by showing that she was treated less favorably than Dent and Moore, African-American employees who were similarly-situated to her.

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115

19

> F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary
> context are the nature of the offenses committed and the nature of the punishments
> imposed."  *Id.* (internal quotations and citations omitted).  We require that the
> quantity and quality of the comparator's misconduct be nearly identical to prevent
> courts from second-guessing employers' reasonable decisions and confusing apples
> with oranges.  *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st
> Cir. 1989) ("*Exact correlation is neither likely nor necessary*, but the cases must be
> fair congeners.  In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999) (emphasis added).  "Absent some

other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel*

*v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000).

In this case, Plaintiff has not produced substantial evidence that any non-white HMA

associates engaged in "nearly identical" conduct and were not terminated.  Defendant asserts that the

conduct of Dent and Moore is not sufficiently similar to that of Plaintiff to make them valid

comparators.  The court need not decide this part of the case on that basis.[4]  Rather the court finds

that Dent and Moore differ from Plaintiff in that they did not have any previous disciplinary records

for violations of the Mutual Respect Policy, under which Plaintiff was terminated.  Dent, who had

no prior corrective actions, was issued a written warning for putting the sign on Wood's back.  (Doc.

---

[4]Although it does not affect the court's summary judgment analysis, the court is unimpressed with Defendant's assertion that a jury could not find Dent's "I like little boys" sign that she taped on a co-worker's back was referring to pedophilia, even if only in a joking manner.  Similarly, the trier of fact could find that Moore's threats accompanied by his command to a co-worker to "make his ass cheeks clap," were at least partially sexual in nature.  Furthermore, Defendant's argument that Moore's remarks did not violate HMA policy because he did not direct his actions at members of the opposite sex is simply off the mark.  Clearly, Defendant's own Mutual Respect and Appropriate Conduct policies make no distinction between actions directed at those of the opposite or same sex.  However, because the court finds that Dent and Moore differ objectively from Plaintiff in that they did not have any previous disciplinary records for violations of the Mutual Respect Policy, the foregoing merely adds to the general conclusion that although HMA oversees a rambunctious work environment, there is no substantial evidence to suggest that it has acted in a racially discriminatory manner in its decision to terminate Plaintiff's employment.

# 14 Ex. A at 99, Ex. G ¶ 33 & Attach. G).  Moore, who had no prior corrective actions, was issued a Level II written counseling (notably the last step before termination) for the incident with Sandridge, and was then terminated upon his second violation of the Mutual Respect Policy.  (Doc. # 14 Exs. G, H, I & J).  Plaintiff had previously violated the Mutual Respect Policy in July 2003 when she was found to have interrupted a team meeting by making an accusation about a dating relationship between her then TM and a fellow associate, and, during that investigation, AR further determined that Plaintiff was causing turmoil on the team.  (Doc. # 14 Ex. F ¶¶ 2, 9–10 & Attach. A; Doc. # 15 Ex. L Attach. 12).  After concluding that Plaintiff had violated the Mutual Respect and Appropriate Behavior policies, on July 16, 2003, HMA issued her a written warning for inappropriate behavior and performance problems.  (Doc. # 14 Ex. A at 56 & Attach. 6, Ex. F ¶ 11 & Attach. B).  Thus, as the repair lot incident on July 20, 2005 constituted Plaintiff's second violation of these policies, HMA could have reasonably concluded that her behavior warranted termination, and there is no comparator of a different race who was treated more favorably.  Courts do not sit as "super personnel boards" to pass on the wisdom of employers' decisions but rather must determine whether there is evidence of discrimination.  *See Tarrance v. Montgomery Bd. of Educ.*, 157 F. Supp. 2d 1261, 1263 (M.D. Ala. 2001) ("Employers have the freedom to make unwise, unsound, or even irrational decisions, and courts do not sit as super-personnel boards"); (*see also Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 951 (11th Cir. 1991) ("the court's responsibility was not to second guess the wisdom of [defendant's] reasoning, but to determine if the reasons given were merely a cover for discriminatory intent").  Finding that Dent and Moore were not "similarly-

situated" to Plaintiff so as to be valid comparators, the court determines that Plaintiff has failed to

make out a *prima facie* case of racial discrimination against HMA.[5]

> **B.   Plaintiff Has Failed to Establish a Genuine Issue of Material Fact Related to Her Retaliation Claim.**

> 1.    Plaintiff Has Failed to Establish a *Prima Facie* Case.

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) participation in

protected activity; (2) a materially adverse action; and (3) a causal connection between the two.

*Cooper v. S. Co.*, 390 F.3d 695, 740 (11th Cir. 2005).  The court finds Plaintiff has failed to offer

sufficient evidence to establish the protected activity and causal connection elements of her

retaliation claim.

To establish a *prima facie* case of retaliation under the Opposition Clause,[6] Plaintiff must

show that "she had a 'good faith, reasonable belief that the employer was engaged in unlawful

---

[5]As the court concludes that Plaintiff did not establish a *prima facie* case of reverse race discrimination, it need not address whether Plaintiff can show that HMA's proffered reasons for Plaintiff's termination are pretextual.  However, even if Plaintiff had established a *prima facie* case, the court also determines that summary judgment on this claim would still be appropriate because she has failed to offer any evidence of pretext showing that HMA's decision was actually based on racial animus.  HMA established legitimate, non-discriminatory reasons for Plaintiff's termination—HMA determined, after a thorough investigation, that she had made sexually offensive comments and gestures and that she continued to treat her fellow associates inappropriately, despite prior warning and discipline.  In response, Plaintiff has done nothing more than make bare assertions about how HMA was "afraid of being sued by blacks" and has unsuccessfully attempted to compare her situation to that of Dent and Moore.  Therefore, she cannot show HMA's proffered reasons are pretext for any racial animus.

[6]It is undisputed that Plaintiff did not file an EEOC charge or testify or participate in an investigation, proceeding, or hearing before her termination; accordingly, she may not assert a claim under Title VII's Participation Clause.  Therefore, the court will evaluate Plaintiff's claim under the Opposition Clause, recognizing that such "acts are viewed in the context of the ordinary business environment, and, thus, are given less protection than Participation Clause acts." *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (citing *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000)).

employment practices. . . .  A plaintiff must not only show that [she] subjectively (that is, in good

faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her]

belief was objectively reasonable in light of the facts and record presented.'"  *Anduze v. Fla. Atl.

Univ.*, 151 F. App'x 875, 878 (quoting *Little v. United Techs.*, 103 F.3d 956, 960 (11th Cir. 1997)).

"'The objective reasonableness of an employee's belief that her employer has engaged in an unlawful

employment practice must be measured against existing substantive law.'"  *Id.* (quoting *Clover v.

Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

None of Plaintiff's reports[7] to HMA appear to concern conduct that she could have

subjectively *and* objectively believed to be an unlawful employment practice.  Plaintiff's report

regarding co-worker Dent's placement of an "I love little boys" note on another co-worker's back on

one occasion cannot objectively be viewed as a report of an actionable sexually hostile environment

under Title VII, especially considering Plaintiff admits that she did not know the history of the note

or its effect upon Wood, was not offended by the note, and that HMA investigated the incident and

disciplined Dent (and Plaintiff was aware of this).  (Doc. # 14 Ex. A at 99, Ex. G ¶ 33 & Attach. G).

Plaintiff's reports of the sexually-related conduct of other associates, which were made for the first

time during the investigation into Semerick's complaint about Plaintiff's repair lot behavior, were

investigated by  HMA and found to be unsubstantiated.  (Doc. # 14 Ex. G ¶ 19; Doc. # 16 Ex. M at

76 & Attach. 1).  Furthermore, Plaintiff admitted she was not offended by any of the conduct she

reported, save, possibly, for that which she attributes to Cotton.  (Doc. # 14 Ex. A at 81, 83, 86, 89,

91, & 106).

_____

[7]Again, HMA investigated Plaintiff's complaints and found them largely unsubstantiated.
(Doc. # 14 Ex. A at 190 & Attach. 16, Ex. C ¶ 12 & Attach. C).

Even if Plaintiff's January 10, 2005 internal complaint about Cotton's alleged comments constituted protected activity, she still cannot avoid the swing of the summary judgment axe because has failed to establish these incidents were causally related to her termination. That is, she has failed to offer substantial evidence to satisfy the causal connection requirement. Although she asserts she continued to complain about Cotton to direct supervisors who had no independent authority to terminate her, she admits that, after her initial January 2005 complaint, she did not complain about him to anyone in AR, who ultimately recommended her termination. To show causation, "the person engaged in the alleged conduct must be aware of the protected activity." *Beard v. 84 Lumber Co.*, 2006 WL 2946883, at *5 (11th Cir. Oct. 17, 2005) (citing *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). It is undisputed that White, who recommended Plaintiff's termination, and Bailey, who approved the termination, had no knowledge of any reports Plaintiff made about Cotton following the January 10, 2005 report to Associate Relations.[8] (Doc. # 14 Ex. A at 198 & Attach. 16, Ex. C ¶ 12). Furthermore, the timing of Plaintiff's termination in relation to her concerns about Cotton is insufficient to establish a causal connection. As the Eleventh Circuit held in *Higdon*

---

[8]Plaintiff cannot establish that Bailey—the ultimate decision-maker in her disciplinary termination—was aware (or even made aware) of her report. (Doc. # 15 Ex. H at 40–42). In fact, Bailey squarely denies being aware of this report and does not remember many of the specifics surrounding the decision to terminate Plaintiff, except that she relied only upon AR's "Summary of Events" surrounding the repair lot incident and the record of Plaintiff's earlier corrective action, neither of which contain any information about Plaintiff's complaint concerning Dent (or *any* of Plaintiff's other complaints to AR for that matter). (Doc. # 15 Ex. H at 40–42; Doc. # 14 Ex. B ¶¶ 14–16). Furthermore, TM Harris, who made the termination recommendation to Bailey, but who could not authorize a termination himself, denied basing his recommendation to terminate on anything other than reviewing the investigation materials procured by White, which, as previously noted, do not contain information about *any* of Plaintiff's complaints to AR, including Plaintiff's complaint concerning Dent. (Doc. # 15 Ex. J at 29–31). Thus, Plaintiff cannot show that either Harris or Bailey—the person making the ultimate termination recommendation and final termination decision—were aware of Plaintiff's complaints about Dent's conduct and, therefore, cannot establish the causation element of her retaliation claim. *Beard*, 2006 WL 2946883, at *5 (citing *Gupta*, 212 F.3d at 590).

24

*v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004), "[b]y itself, [a] three month period between the [alleged protected activity] and [the adverse employment action] does not allow a reasonable inference of a causal relationship between the protected expression and the adverse action." Plaintiff's termination on August 3, 2005 occurred 205 days after she complained about Cotton, much longer than the 93 days in *Higdon*; therefore, temporal proximity is insufficient to establish causation as a matter of law.

Moreover, as several courts have held, "any inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established." *Wu v. Se.-Atl. Beverage Corp.*, 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004) (citing, *e.g.*, *Robinson v. AFA Serv. Corp.*, 870 F. Supp. 1077, 1084 (N.D. Ga. 1994) (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); *Booth v. Birmingham News Co.*, 704 F. Supp. 213, 215–16 (N.D. Ala. 1988) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," *i.e.*, other reasons for the adverse action arising after the protected activity), *aff'd without opinion*, 864 F.2d 793 (11th Cir. 1988)). Here, as in *Wu* and *Robinson*, Plaintiff had been previously warned by HMA about violating the Mutual Respect Policy and Appropriate Conduct Policy. Furthermore, and in any event, there is a discrete intervening event[9]—*i.e.*, AR learned of Plaintiff's repair lot conduct via Semerick's report (the exact

---

[9]Plaintiff insists that she reported Dent's conduct on July 20, 2005—the same day of the repair lot incident and two days prior to Semerick's complaint about Plaintiff; however, all of the records (save Plaintiff's bare assertion) show that the date of Plaintiff's report was July 22, 2005 *and* Dent's *conduct occurred* on July 20, 2005. To be clear, however, at least for the purpose of determining whether Plaintiff's repair lot conduct was an "intervening factor," the exact date of the report is irrelevant. This is because, regardless of when Plaintiff contends the report was made, Defendant asserts her termination was as a result of that conduct, and no party disputes the conduct itself occurred on July 20, 2005. Therefore, even if, as Plaintiff alleges, she reported Dent's conduct

conduct for which HMA claims Plaintiff was terminated)—that would break the causal link between Plaintiff's report regarding Dent's conduct and HMA's alleged retaliation. Therefore, Plaintiff cannot establish the causation requirement of her *prima facie* retaliation claim.

### 2.    Plaintiff Has Failed to Produce Substantial Evidence of Pretext.

Plaintiff has also failed to establish that HMA's aforementioned reasons for her termination, namely sexually inappropriate comments and gestures and a history of inappropriate conduct towards team members, were mere pretext for retaliation. She offers no evidence—aside from the timing of her AR report regarding Dent's conduct and her own behavior reported by Semerick to AR[10]— that any of her complaints caused her termination. As the court has previously discussed, no matter whose version of the facts is believed, when she reported Dent's note and sexually inappropriate conduct of other associates in the zone, Plaintiff had already engaged in the conduct leading to her termination. (Doc. # 14 Ex. A at 136–37, 139–40, 228–29). Also, as previously noted, temporal proximity between Plaintiff's report to AR regarding Dent and her own termination is insufficient to establish pretext where Plaintiff had previously been warned about inappropriate behavior and continued to engage in conduct violating HMA policies (*i.e.*, the repair lot conduct). *Wu*, 321 F. Supp. 2d at 1337 (N.D. Ga. 2004) (citing, *e.g.*, *Robinson*, 870 F. Supp. at 1084; *Booth*, 704 F. Supp. at 215–16). Thus, for all these reasons, Plaintiff has failed to offer any other evidence to establish that HMA's reasons for terminating her were pretextual or that retaliation was the true reason.

---

on July 20, 2005—and this is what the court accepts as true for summary judgment purposes— Semerick's report to AR of Plaintiff's own repair lot conduct would still be an intervening factor that destroys a presumption of any causal link suggested by the timing of Plaintiff's complaint to AR and her later termination.

[10]Of course, it is not lost on the court that if it were to allow this claim to go to a jury, Defendant may well argue that it was Plaintiff who caused the "coincidental timing" between these two events in that her action may have been a *re*action to Semerick's report.

### C.    A Genuine Issue of Material Fact Precludes Summary Judgment for Defendant on Plaintiff's Age Discrimination Claims.

As noted above, HMA has put forward substantial evidence that: (1) after investigating Plaintiff's conduct, it believed in good faith that Plaintiff had violated (for a second time) its Mutual Respect Policy; and (2) there is no evidence that Plaintiff was treated less favorably than a similarly situated person of a different race.  If there were all there was to this case, HMA would be entitled to summary judgment on all of Plaintiff's claims.  Unfortunately, for HMA, at least as it relates to Plaintiff's age discrimination claim, there is "the rest of the story."

The Age Discrimination in Employment Act of 1967 ("ADEA") provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In order to fall under the ADEA's protections, an employee must be "at least 40 years of age." 29 U.S.C. § 631(a).  In cases arising under the ADEA, t he Eleventh Circuit has adopted a variation of the *prima facie* case standard  for Title VII claims which was articulated by the  Supreme Court in *McDonnell Douglas*. *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992). "Under this variation of the *McDonnell Douglas* test for establishing a prima facie case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons [over] the age[] of 40 . . ., (2) was subject to adverse employment action, (3) was replaced with a person outside the protected group, and (4) was qualified to do the job." *Id.* (citing *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064 (1990).  Here, there is no dispute that Plaintiff was in the protected age group and that she suffered an adverse employment action.  Furthermore, although Defendant insists that Plaintiff was not specifically replaced, the next

associate hired into Plaintiff's former zone and team (Zone 23, team "B") was Donna Davis, a 44-year-old white female. The court finds this evidence is sufficient to withstand summary judgment on the issue of whether or not Plaintiff was "replaced with a person outside the protected group." (Doc. # 19 Ex. 3).[11]

The court further finds that unlike her race claim, Plaintiff can point to a sufficient comparator to go forward with her age claim. That is, Plaintiff has presented sufficient evidence from which a trier-of-fact could conclude that she was disciplined differently than a similarly situated younger person, Kevin Bennett. Bennett was a 27-year old employee, who was terminated on August 22, 2005 following a complaint against him for sexually inappropriate comments and gestures that was substantiated by an AR investigation. (Doc. # 14 Ex. B ¶ 19; Doc. # 14 Ex. E ¶¶ 13–14 & Attach. E & F). Associate Catrina Boley complained to AR representative Mark Graham that Bennett had made inappropriate sexual comments to her calling her "wonder bush" and "shaggy"

---

[11]To the extent HMA argues that even if Davis were Plaintiff's replacement, that means she was replaced by a female who is also within "the protected group," that argument is off the mark. As the Supreme Court has held:

> [The ADEA] does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.

O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996). Thus, the fact that Plaintiff, who was 57 years old at the time of her termination, was replaced by a 44 year old, who is also in the ADEA's protected group, is of no moment. Her replacement by someone who was substantially younger than herself is sufficient to establish that element of the *prima facie* case.

in reference to her pubic area and asked her if she would like to borrow his Norelco.  (Doc. # 14 Ex. E ¶ 13 & Attach. E).  AR Representative Thomas investigated the allegations and recommended termination of Bennett after his interviews corroborated Boley's complaint and uncovered additional inappropriate comments.  (Doc. # 15 Ex. K at 60; Doc. # 14 Ex. E ¶ 13 & Attach. F).  Thomas stated that Bennett made it easy for Thomas to recommend termination, because "if you look at the documents, he didn't deny a lot of it," and, therefore, there was no need for Thomas to make a credibility determination.  (Doc. # 15 Ex. K at 61).  Again, if this were all there was to the matter, the outcome of HMA's motion for summary judgment may be different.  But there is more.  There is evidence in the Rule 56 file that before his discharge, Bennett was treated more favorably than Plaintiff.

At the time of his termination, Bennett had the following discipline: (1)  he reported to work under the influence of alcohol, and then lied about it to AR (Doc. # 15 Ex. K at 29–30); he received no discipline for this, but he did get a paid suspension in spite of the fact that having alcohol in one's system violates policy as does providing false information (*Id.* at 31, 32, 43; Doc. # 19 Ex. 5); (2) Bennett violated the Appropriate Behavior and Mutual Respect policies by engaging in horseplay and for this offense he received a Level I written counseling (Doc. # 15 Ex. K at 37–38; Doc. # 19 Ex. 6); (3)  Bennett had two coachings for harassment and horseplay (Doc. # 19 Ex. 8); (4) Bennett had received a verbal coaching for inappropriate conduct toward a female whom he had been dating (Doc. # 15 Ex. K at 46); (5) Bennett received a Level II written warning for eleven violations of safety and performance policies and five violations of the Appropriate Conduct Policy (Doc. # 19 Ex. 7); (6) when caught spray painting graffiti on the wood floor conveyor, Bennett lied to AR, and one of the spray-painted images was a smiley face with a long, oblong object protruding from its

mouth (Doc. # 19 Ex. 7 at 717; Doc. # 15 Ex. K at 52); and (7) Bennett told his manager, Reid White, that he had drawn a picture that looked just like him with "one this long in his mouth, holding his hands twelve inches apart." (Doc. # 15 Ex. K at 54, 57, Attach. 16).  For this last offense the AR representative recommended termination, but the recommendation was not followed by AR (*Id.* at 56).  Bennett was informed each time that his performance and behavior must improve or would be subject to termination on the next offense. (Doc. # 15 Ex. H at 48; Doc. # 19 Exs. 5, 6, 7, & 8).

Defendant asserts that Bennett's conduct is materially different from Plaintiff's, and that he is not her valid comparator for purposes of her *prima facie* case under the ADEA or in order to show that their proffered reason for her termination (her repair lot conduct and previous discipline) is pretextual.  The court disagrees.  Bennett was specifically found to have violated the Appropriate Behavior and Mutual Respect policies *and* had previously received verbal coaching for numerous offenses, including inappropriate conduct (involving physical contact) toward a female whom he had been dating.

At oral argument, HMA also insisted that Bennett's behavior was substantially different from Plaintiff's because, although Bennett's actions were sexual in nature and directed at a member of the opposite sex, the female target of his conduct was not employed by HMA, but by their food service provider.  The court finds this argument does not hold water because it is clear that HMA's policies prohibit HMA associates from the harassment of employees and non-employees alike.

Finally, Defendant insisted at oral argument that the "first time" Bennett did anything sexual in nature toward another employee, he was terminated.  The court  disagrees that this is the only reasonable inference that can be drawn from the Rule 56 evidence.  A reasonable trier-of-fact could conclude that Bennett's drawing graffiti on the wood floor conveyor depicting a smiley face with a

long, oblong object protruding from its mouth and telling his manager (also an employee) that he had drawn a picture that looked just like him (the manager) with "one this long in his mouth" (holding his hands twelve inches apart) was "sexual in nature."  (Doc. # 19 Ex. 7 at 717; Doc. # 15 Ex. K at 52, 54, 57 & Attach. 16).  It is undisputed that Bennett was not terminated for this "arguably" sexual conduct directed at another employee (his manager).  (Doc. # 15 Ex. K at 56).

This evidence of HMA's different treatment of Bennett, taken together with the negative age-related comments Plaintiff has attributed to Cotton (and which Cato allegedly concurred), is sufficient to allow Plaintiff to present her age claim to a jury.  (Doc. # 14 Ex. A 112–13, 118, 189–91, 197–98 & Attach. 16).

## V.    CONCLUSION

For the reasons set forth above, the court finds HMA's motion for summary judgment (Doc. # 12) is due to be granted in part and denied in part.  Specifically, the court grants Defendant judgment as a matter of law on Plaintiff's race discrimination and retaliation claims, but the court finds that a genuine issue of material fact precludes summary judgment for Defendant on Plaintiff's age discrimination claims.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this _____18th_____ day of July, 2007.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE